Okay And we'll call the next case on our calendar It's the case of in Ray a a liquidation ink at all Mr. Mr. raisner Thank you your honor Jack raisner for the plaintiffs and at Borrella and John DeMura from Alton and Golden and I would like to request two minutes of rebuttal Request to be granted. Thank you. Glad you made it back from your visit to To the capital it was a very very interesting experience your honor. Thank you Not to travel you didn't want to travel back just yeah, we didn't want to deny you that opportunity But I hope you understood that here this week, and we need to get this resolved, so It worked out just perfect. Thank you very much consideration. You requested how much time for rebuttal two minutes Please that request to be granted When parties consent to a sale with inherent risks They should be able to go ahead with the sale of a business but if those risks are realized and those parties are harmed the law is not offended because those parties Accepted those risks when they went into a risky sale but if the risks in that sale are realized and They harm employees who are not informed That these risks were coming down the pike Then those employees are going to be harmed And they will have not had a chance to consent or to prepare themselves and in that case the law is Offended and the law is the Warn Act the Warn Act was passed to give such employees 60 days advance notice So they could prepare themselves for the harms that before people who are suddenly unemployed and have financial crises that follow Judge Greenberg is Not here in person, but it is Listening in by audio make sure you keep your your voice up if you'd raise that microphone just a little bit How did you know though that it made any difference to the employees That it really caused them to lose their jobs The court found Apparently it's clear that you were it was beyond the 60 days After the 60 days passed the notice had to be given but how do you know that it would have caused the Then Your honor The company Terminated the employees on February 19th of 2009 Well Whether it was the 19th or the 24th the employees were sent home without a job on the 19th We're told if they were terminated on the 24th But that came as a complete surprise to them in the depths of the Great Recession And so they could have spent money on On trips on investments on a home on cars up until that date not knowing they wouldn't have a job on the 19th or the 24th not having a chance to send out resumes not having a chance to look for the next job to allow themselves time to retrain or to Just prepare for unemployment is a hardship that has been recognized by Congress and by this court But the law the law also recognizes that there's risk Inherent in every business transaction and so the particular exception we're talking about has embedded in it they're reasonable foreseeability standard and We're told by the regulations that that also incorporates reasonable commercial judgment Every court has addressed this seems to have adopted a probability standard as informed by commercial judgment Why shouldn't we adopt that standard? The standard in fact is reasonable foreseeability Not probability and those are two different terms and there should be no reason to go to a standard of what is the probable or the clear Import of offense Because that's not what Congress passed to go to a higher standard than reasonable foreseeability Almost concedes that there were risks that were reasonably foreseeable. How would you articulate the standard? Is it a mere possibility? No, it's what is a reasonably? Foreseeable to a simply situated employer Using commercially reasonable business judgment. Does that mean more likely than not? How would you articulate that standard beyond Probability, which seems like the way courts have tried to interpret reasonable foreseeability If we could talk about the facts of this case, your honor, I think it becomes very clear They were going into this sale. We need a standard to apply to this the standard should be and has worked fine for 20 years as reasonable foreseeability that Subject to an objective standard not the subjective assessment of management But to an objective similarly situated employer looking at a situation and understanding would that person have perceived reasonably a foreseeable risk of Closure that standard works, but employers can foresee that something could go two different ways. Is that enough? It's 50-50 Would you say that's reasonably foreseeable in any time? There's a business risk that might lead to layoffs at a 50-50 probability that they need to send out a warn notice I can't speak to every situation because every case is case is case It's fact sensitive and it's a highly fact sensitive issue applying the standard So to apply it in in a void of just abstract numbers is very difficult But let me just put it this way your honor. Let's say you're at a roulette table And the ball is in the air and it's spinning around and it can land on red or black Is any of those two probable one against the other but they are both reasonably foreseeable because there are two outcomes and One can be drastically different from the other and if both of those outcomes are in play and the employer cannot tell Which is it going to be when this company ran out of money? Which was predictable would it have its employees in its tow or would they be elsewhere at that point? you do have to give a notice because the possibility of the Word possibility. Well, no, the word possibility is not a bad term your honor in roulette black and red are both possibilities We can't tell which one it's going to be. You have to be clairvoyant If I was reasonably foreseeable Judge Greenberg has a question. Yes. Well, I just said if I was playing it would come up green I think you have a couple of green numbers That's that's correct. And and there's there's always a wild chance that something Truly unforeseen will happen. But when the when the odds are 50-50 as Runner suggests and one will be determined means termination and the other means Possibly not termination. That is a reasonably foreseeable Circumstance for which award notice should be given because those are actually fairly rare How does understand how that would be workable because that that's standard that was rejected by the eight-circuit in Hawkeyes? Because among other things of their concerns about its administrability if every time there was a Possibility even a reasonable possibility of that outcome and we're notice sent out We can't be blind to the fact and the regs are actually sensitive to the commercial reality that sending out that kind of notice has an effect on the workforce and the continuity of the workforce on business partners on goodwill in the marketplace I Can we really use just a possibility standard wouldn't there be willy-nilly notices that needed to be sent out The punier possibility would be just justice Greenberg's green Scenario but when it's 50-50 black or red and that was the case in this company It knew it was going to be liquidated on for about February 14th Was whether its employees would be in its toe which still be with it or will the employees have in a contingency been Shipped off to another employer when you're facing that prospect in a liquidating bankruptcy with the With the liquidation is known. It's planned. It's finite And you don't know where the ball will fall in that situation the typical Practice the routine operational practice in America is to give an email a warn email to that workforce and let them know that we expect that we are entering in an APA and a Asset a purchase agreement. We do not know we are not sure if the employer is going to be hiring or Is that what I mean? What you know we had the warn act is there and They're you know, there's some gray area and we're arguing about the gray area when that notice needs to be given but it seems to me that Accepting your argument. We may end up running the risk that Anytime there's a chapter 11 filing one of the additional Papers, it's gonna have to be assembled in that filing will be a notice to all employees on the warm race now Is that good or is that bad you're on it that would not be the outcome this is a case Why would that not be that is the case specific finding and ruling in this matter your honor? if you have a chapter 11 liquidating sale and the financing is in the bank and The employees have been given agreements to adjoin the purchaser. I would not send out a warn notice and I Sometimes Hear me a second sure We're in bankruptcy. Yeah, okay We're in bankruptcy. They were in bankruptcy During during the entire time they're in bankruptcy. There was the prospect of this sale Okay, which was in January, I believe Approved by the bankruptcy court. Okay, the sale Was approved by the bankruptcy court was sort of a dead-end date of February 28th the last date of the APA Okay My question is under circumstances like that. Do we always want to have a warn notice? Is that really what Warren is about? if the financing has Such Indeterminacy that it is coming from the Kremlin with no expected date of appearing and no way to determine when it will come then the answer is yes, okay when the Buyer has made no effort to hire anyone. I think there is a Huge question. We don't have to reach that in this case No effort to what it has made no effort to hire anyone the buyer has Repudiated any obligation to hire anyone in this asset sale and said it will not be responsible for having to do so When you have a finite date that time Isn't that boilerplate then the court then the bankruptcy could find that that language is boilerplate. Well, that is a opinion of a court that for which there is no evidence to support there was no evidence as to whether that was negotiated or not and and how Genuinely the buyer was committed to to uphold and enforce Ask answer me this. When do you think the war notice should have been given? There is a strong argument that should be should have been given in December because of the track record of Indeterminacy of the financing of this buyer with this particular amount of money from this source Which was the Kremlin which for six months had been delayed with the same kinds of excuses not that we know in December What will happen but based on a track record where the buyer said we have approvals of Vladimir Putin that's hard to say when the money will come having said that for six months and coming into a an asset sale with a narrow window, it's like jumping from a window of a building into a postage stamp trampoline You have a risk that the indeterminacy of financing will conflict with the inelastic This is not your typical business. This was a this was a this was an entity that had been dealing with Purchasers in Europe Purchasers in Russia The members of the board and the principal shareholder had Russian ties It was as you said 2008-2009 everything was rocky everywhere Maybe no more rocky and going to the Russian Bank BB even going to Mellon Bank or PNC Bank And the question becomes You know, what what was reasonably foreseeable in this case? There were so many Contingencies and as I say Indeterminacies that it's a very strong argument that there should have been a simple routine Message sent to the employees. We're entering into this as I said this asset purchase We expect that the buyer will offer jobs, but due to the inherent Uncertainties we are letting you know that if the buyer doesn't offer jobs that we expect that there will be Likelihood of layoffs and the date of the closing is 14 day window in February Just sending that email would have cured all of these problems So the Warren Act is very reasonable and that's what standard operating procedure is for this company to not have done That was a violation of the law and it doesn't it doesn't send a signal to the rest of the country to say it should Have happened in this case to say that it happens in any case for any possibility whatsoever This is so it may be fact-specific but Elsewhere our own case law says that we look to the relationship of the business dealings between the parties and when we do that here is seeing that there is a You know 20 something million dollar commitment that's made In even in November that there are strong ties as judge Fischer said between these parties That there have been multiple investments that the buyer made in In this company between December of 2007 and November of 2008 That we've got the bankruptcy court approving the sale that there are no financing Contingencies that are put on it and then through February on a near daily basis They're getting they're diligently seeking and receiving assurances that this is getting a Review for approval At the highest levels of the Russian government and that that's going to be turned around in a matter of days The Spanish banks financing was already secure Why then looking at specific facts of this case and and that history of business dealings? Isn't there enough looking through the lens of reasonable? commercial judgment For them to believe that it was still likely as they said in their very initial notice to them On the furlough to employees and that the sale was going to go through Your honor will do respect the lower courts ignored half of the record. They ignored the first part of the sentence We have commitments. We have assurances we have optimism the second part of the clause of every sentence that was ignored and none of the dealings in the summer were Recited were but we don't know when the money will come. We have other problems We don't it's hard to say what's going to happen next so the full record with all of the evidence would show that any of that optimism was rebutted by a an indeterminate Statement that She Rebutted any assurance that should have been given plus in February It was no longer clips as managers who are in charge It was someone named Kenny Cressa who was the application of all the creditors the person to decide Whether there should be a layoff. He said immediately. I'm not going to listen to any verbal assurances whatsoever We will not consider them which happens to be the Warren law Which you can't you cannot give credence to any of these managers and Lowell people who was the CEO is the prime insider. You can't give any credence. It's a hearsay rule Would you have our our circuit then? Rejected a presumption That that other circus aside goes along with a going concern sale that those employees will continue to be employed Gone concern sale was rebutted by the fact that the APA said specifically the boys will not be Board 6.7 that Eclipse has to continue operating as a going concern and that the employer can't take any steps that are going to impair the employees Availability for its future employer, there's no evidence of sending a warrant email impairs anything There's nothing inconsistent with giving a warrant notice in the midst of an APA sale There's never been any evidence in any court in any circuit that has said that it has led to layoffs that it has led to premature Terminations of voluntary terminations by employees that it is doomed anything or impaired anything that is digna that language Exists, but there is certainly no evidence on this record that a warrant notice would have done anything to the contrary The buyer roll paper was happy to go ahead with the sale Even though he was told 75% of employees would be let go. This was in November. He said fine We're gonna take it anyway So his sense of what a growing concern sale is is one thing but a and it didn't mean that there had to be employees You know your honor the going Concern sale does not mean that there won't be a mass layoff And the only concern sale does not mean that 100% of employees will be brought on Termination of 33% will be a violation of the Warren Act So is your position that there there it is appropriate for courts to adopt a presumption of? Continued employment with a going concern, but on the facts of this case It's rebutted or that that presumption and is an improper presumption It's it says that the presumption is proper unless something else negates it or something else comes in the way Something else is here or an elephant that you can't put into the mousehole of Just as something else. Mr. Raisiner. We'll have you back on rebuttal. Thank you, Your Honor. Thank you for your comments Mr. Klayman Good afternoon, Your Honors. My name is Barry Klayman. I represent the appellee, Jeffrey Birch, who's the Chapter 7 trustee for AE Liquidation Incorporated. I'm here with my colleague, Mark Felger from Cosin O'Connor. Let me start. I had intended to start with what the circumstances were in December of 2008 that was facing the debtor at that time. But frankly, Judge Krause, you summarized it very well for me what the situation was. The company had already filed for bankruptcy, so it was in bankruptcy at the time. It had this agreement, this asset purchase agreement that it had entered into. It was for the sale of the business as a going concern basis. And I would add to the judicial presumption that a going concern sale includes the transfer of the employees, that the WARN Act itself has an exclusion for a specific section dealing with the sale of a business, which imposes upon the buyer of a company that is being sold as a going concern the obligation to deal with the WARN Act. The theory is that it is the buyer who is making the decision whether or not to retain the employees. Therefore, the buyer has the WARN Act obligation to notify employees if their employment is not going to continue. Even if there is a presumption... At what point do they have to make that warning? Excuse me. Do they make it before the closing? At what point do they give that warning to the buyer? As I understand the Act, the buyer gives that warning at the time it makes the decision whether or not to continue the employees. In effect, there is a presumption that the employees are going to continue on in their employment. And then the buyer makes a decision as to which employees the buyer intends to retain and which not. And if the number of employees that the buyer does not intend to retain hits the threshold level under the WARN Act statute, they would be required to give the WARN Act warning. So would that be after the buyer closes? Yes, Your Honor. I believe it would be after the sale closes. So the seller has the obligation beforehand? If the sale never closes, then the seller has the obligation to provide the WARN Act notice. And then the question is the relationship of the unforeseen business circumstance. If the reason the sale does not close is because of an unforeseen business circumstance, then the warning is either excused or a late warning is permitted. The going concern issue for the moment before we turn to the business circumstances. Even with the presumption, why given not only the terms of the APA here, but the testimony that was given by three different witnesses as to their unwillingness to commit to continued employment of the employees, why wouldn't a presumption be rebutted on the facts of this case? Do we really want to chalk it up to boilerplate when that's what the parties, that disavowal of any commitment to the employees has been stated expressly in the agreement? Well, I think what's stated in the agreement is not a commitment to retain all of the employees. It really is a boilerplate provision that gives the buyer discretion as to which employees to continue and which not to continue. And I think Judge Walworth recognized that. And I think she's familiar enough with enough of these asset purchase agreements in the context of bankruptcy to understand that the buyer's not going to commit sight unseen to employing all of the employers. But at the end of the day, the seller here had the obligation to retain all of the employees. It had an obligation to maintain the business organization and structure of the company. It had an obligation as well not to interfere with the, not to offer any employment or alternative employment to any of the employees or interfere with the buyer's ability to hire those employees. So I think in this case, this is not really the circumstances that would rebut the presumption that those cases are referring to. With respect to the testimony, I think you'll find that the testimony is a little bit conflicted. That is, the buyer, consistent with the asset purchase agreement, said, I haven't made a commitment to hire everybody. On the other hand, Mr. Piper has testified that there were no plans or promises to retain Eclipse's employees, not a commitment not to hire everybody or that he was going to be picking and choosing amongst a small group of management, for example. But with a general statement like that, why wouldn't that be enough to rebut a presumption? I would say that that would be offset by the fact that the asset purchase agreement required that the sale be on a going concern basis, that it required the seller to retain all of the employees until the time of closing, and that it prohibited the seller from interfering with the employment relation with the employees. I think you have to look at the entire context of the statement that he made. And I think in that circumstances, if the buyer chose not to retain employees, then the buyer would have had the obligation under the Warrant Act to provide a warning so the employee still had protection, but the protection comes from the buyer, not from the seller. How about foreseeability of the business circumstances here? I mean, at least at the point where the board wanted to speak with Russian counsel and get some understanding and assurance of what was going on and wasn't permitted to do so, at that point shouldn't there have been a kind of flipping of the switch from a possibility to a reasonable foreseeability that there was really something amiss? I think if you look at the circumstances that took place between essentially February 1 and February 24 when the conversion motion was filed by the secured note holders, that you find an independent director who is trying to do his best to pin down the time when the closing is going to take place, when the funding is going to be available, when the bank that needed the additional capital was going to be actually recapitalized as opposed to the approval coming through. So yes, there were issues and questions that had been raised. But at the same time, as both courts below recognized, they were getting assurances. There were ongoing conversations with the state-controlled bank, with VEB. There were ongoing discussions at the highest level of the Kremlin to the extent that the Kremlin had to be involved in approving the transaction. And it appeared at least until, I believe it was February 21, that they were making progress and that there was still a lot of optimism that the sale was going to close, that the funding was going to be available. And I think that that comes through even when you look at the limits of the disinterested director meetings. Chapter 7 liquidation was considered at every meeting in February. The fact that it was considered doesn't mean that they had either abandoned the sale or felt that the sale wasn't going to go through. I mean, the fact that they were preparing for a contingency, I don't think suggests that they didn't think that the sale was no longer reasonably foreseeable. They were getting advice from lawyers who were saying, you have to be prepared for this, you have to be prepared for that. That doesn't mean that it rises to a probability. We knew that it was the circumstances that would have required the low indices. Mr. Klayman, Halkius developed the probability test for reasonable foreseeability, but my question to you is, is that the right test? Reasonable foreseeability is not defined in the Warren Act. Reasonable foreseeability, if you look at its ordinary meaning, may not be the test that Halkius has come down with. Isn't our obligation to look at the text of the statute? It is, and I think you have to, reasonable foreseeability is not defined. So the question is, when you look forward to applying a commercially reasonable test, a commercially business judgment type test, what level of certainty do you have to have in order to assume that the circumstance isn't going to take place? And I think to classify it as a probability rather than a possibility makes a lot of sense. I think this court actually has already adopted that standard. I think you adopted that standard in footnote 7 in the Elsinore opinion. When you made a distinction, the court made a distinction between a possibility and a probability in terms of whether or not a notice was required to be given. So I think that it is an appropriate way to deal with it. Whether it has to be a 50-50 probability is another question, although I think that to understand it in terms of more likely than not makes a lot of sense. Do we need that standard to prevail? I don't believe that we need that standard to prevail because I think that we still satisfy the reasonable foreseeability test, as long as that reasonable foreseeability test is not a mere possibility. Because I think the problem is that when you deal with the phrase mere possibility, there are a myriad of possibilities that can occur. Again, this isn't a question of rolling a ball on a roulette wheel and trying to understand the probability of where the ball is going to roll. The probability of how that ball is going to land is sort of built into the roulette wheel. That's not the situation here. You can sit down in advance without knowing the facts, without knowing the circumstances, and come up with a decision tree of a whole host of alternatives that take place if the test is going to be mere possibility. So what I would say is that even if you don't adopt the probability test, and I think the courts that use the probability test are talking about, more likely than not, 50 percent or better as a means of trying to understand reasonable foreseeability. But even if it's less than a 50 percent probability, I think that we still prevail. I think the only way we lose is if you adopt a mere possibility that anything can happen, which I think is the test that the appellant is advocating for, because basically the appellant says, well, once you're in Chapter 11 and you're going to go through a sale, you automatically have to give everybody a warning. And the problem with that is that when you're trying to sell a business, to maximize the return on the business by selling a business as a going concern, you can't be in a position where you put out a notice that tells your employees, and particularly your most skilled employees, that now's the time to start looking back up. Isn't the mere filing of bankruptcy itself perhaps enough notice to many employees to say, hey, we ought to be looking somewhere else. We're not sure how long we're going to be here. You know, it may be. And in fact, what that does is to cut against the notion that you need the WARN Act in a situation where you have a bankruptcy and the company's floundering. But there is the WARN Act, and there's a requirement to comply with the WARN Act. Let me ask you about the disinterested directors. You had two disinterested directors, Mr. Kresna and Mr. Poling. And as of January 30th, I believe, they were ready to approve the Chapter 7 filing. Well, actually not. If you look at the minutes of February 4, they made a decision not to make a Chapter 7 filing. They made a decision, but on January 30th, they were leaning towards They may have reconsidered their position on January 30th. They were leaning towards Chapter 7. Well, they received, if you'll recall, they received an explanation of what was going on in Russia at the full board meeting on February 3rd. And then February 4th, the disinterested directors meet. They make a decision not to convert to a Chapter 7. They also make the statement in the minutes that they have no reason to disbelieve what they're being told is going on in Moscow. And what they did is they instead request specific documentation of some of the things that they were being told that was going on in Moscow. And, in fact, they got that specific documentation on February 5th, the next day, when they got a letter from the governor of one of the Russian regions who was involved in this sale transaction and talked about the decision being made to recapitalize the bank and reaffirmed the decision to go forward with this particular project and to fund this particular project. You don't find anything further from the disinterested directors until February 11th. But on the 4th, wasn't it Mr. Kressa who suggested the unpaid furlough? He said we would have to consider it, but he didn't make the decision to do it. And the decision to do the unpaid furlough did not take place actually until February 16th. February 16th. Correct. I guess the point is, though, from January 30th on, you seem to be moving down a road where there's more and more question about whether or not this closing is ever going to take place because of the possibility that the Russian loan to the company might arise. I think that when you look at the record, what you see is as time goes on, at least until I believe February 21, the question is when is the loan going to close, not whether or not the loan is going to close. The money is going to be available so that the sale can close. When did Eteric put in the $20 million of additional dip financing? The dip financing was put in at the very beginning. So that was at the beginning. Correct. And it was essentially matched by the, and this is very important to keep in mind, by the ad hoc committee of security note holders who were making available millions of dollars to finance the company, again, I think is a reflection of their reasonable belief that the sale was going to close. And my understanding about the way that the cash collateral order reads, it actually had money being freed up at various points in time. And if my recollection is even the dip order had the money being available at different points in time. Does dip financing become an administrative priority? I believe it does, yes. Yes. But again, in terms of, and this goes back I guess to the point that Judge Krause had at least adopted in the question, that these two companies had a long relationship, a long history, that Inter had a lot committed to going forward with the sale and was doing everything possible to make the sale close. How should we think about, as we're trying to define and apply a reasonable foreseeability, how do we think about the role of commercial judgment there? And keeping in mind that reasonable foreseeability and reasonable commercial judgment, at least the regs, would seem to suggest an objective standard. If we have a situation where over the course of time and even a relatively short time, there are increasing doubts and as a business reality, as the folks who are in the know look at the situation, they have reason to hope against hope because of how much is riding on the deal. And given what's involved from an investment perspective, even as that possibility from the probability of it going through to a possibility to feeling like it's even under 50 percent likely, but what weighs on the other side has them wanting to hold on. Do we look at that to say, well, that's commercial judgment and so that should inform whether this is reasonably foreseeable? How do we apply those two concepts and what seems to come across from the language of an objective standard? I was going to say, while I would like you to adopt that standard that seems to have a certain amount of subjectivity in it, as I read the cases and the cases that have been cited by both parties in this case, it's an objective standard. So while it has to be what is commercially reasonable, it is the court that is making, based on the information that it has, a decision as to when it becomes commercially unreasonable to hold out hope that the sale is going to close. And I would suggest in this case that some indication of that came from the fact that the secured note holders, when they filed the motion to convert the case to Chapter 7, if you read the motion that they filed, they said that it was as of, I believe they said February 21, when it became probable to them that the sale was not going to close. And up until that point, I think the issue really was when is it going to close, how much money is going to be made available at what time, and that's really what everybody was negotiating with. We're reviewing the legal question here of when the notice had to be given on a plenary basis, but what finding of facts are there that the bankruptcy court made that support your position that we need to review for clear air? I'm sorry, say that again. Which findings of facts that the bankruptcy court made in this case do we need to look at as we review them for clear air? Well, frankly, I think that the standard that you have, because it was a summary judgment motion that was granted as plenary review. It is. Yes. And I don't, if I were to tell you a fact that I thought that the bankruptcy court got wrong, I would tell you that I didn't think she got any of the facts wrong, nor did I think the district court got it wrong. But what you're faced with is a plenary review, so it's not just a question of whether she abused her discretion or whether or not she was clearly erroneous in some finding. I think your review is a little bit broader than that. I couldn't help when I read this case. I think in all my 43 years as a judge, I never saw a situation where they had a state-approved or private loan, and I thought, you know, it's inherently very questionable whether that would happen. I mean, nobody's going to tell Putin what to do. I mean, you would think that people would be very concerned from the beginning of such a standard. Your Honor, I can't speak to the exact procedure that was being followed in Russia as far as the loan is concerned. I know what the events were that happened, but I don't know the reason that they happened. I do know that at least as of the time of the asset purchase agreement, there was a commitment letter from VEB Bank. The fact of that commitment letter is recited in the asset purchase agreement itself. And again, at the February 3rd board meeting, one of the IRTURB representatives sitting on the board made it very clear that he believed that the commitment letter that they had received from the bank was enforceable. So how exactly Putin got involved into the decision-making is not clear to me. I think it's not clear on the record, but I don't think that as businessmen sitting from the outset looking at the agreement that they were going to enter into and what was going to happen, that they thought that that was something that was necessary to the process because they had already had a commitment letter. I think the problem there was the unexpected circumstance of a state-controlled bank running into capitalization issues. I have a question on sufficiency of the notice. And that's the WARN notice that was sent out. It doesn't reference the WARN Act itself. How could a brief statement of the basis for reducing the notification period satisfy the mandate of the statute and give to employees the information they need to determine whether a notice period was properly shortened under the Act if there's no reference to the Act itself? Well, there's no requirement that any notice contain a reference to the Act. That's the question. I have not seen any case law and many cases that are cited by either of the parties in this say that it has to refer to the Act. What it has to do is to explain why shortened notice, why they couldn't get notice sooner. And the courts below, we believe that the notice was sufficient because it explained why the notice was being given at the time that it was being given. And that is it was because of the conversion of the case, the delay in closing of the sale transaction. Which notice? That's the February 24th notice that said that. The February 14th notice was actually a notice of a furlough. And as we explained in our brief, the furlough itself didn't necessarily require a WARN Act notice because it was not intended to be a long-term furlough. And under the statute, if the furlough is less than, I believe, it's six months, it's not an employment law, so it doesn't come under the terms of the WARN Act. The actual notice was retroactive to the 19th, was it not? Yes, it was, Your Honor. Does the WARN Act allow for retroactive notices? I haven't seen anything that says that it doesn't allow for it. And there is certainly a Department of Labor regulation that says there may be occasions when the notice may come out after the termination. So presumably that would allow for a retroactive termination. Okay. This case came up on summary judgment. When I review a case, I always write down certain thoughts I have. And what I wrote was this. Because of conflicting evidence, this is sort of a question, because of conflicting evidence, we cannot say as a matter of law that it was not necessarily foreseeable that the company would be forced to make a layoff before February 24, 2009, when it sent out the WARN notice. Why is that wrong? Why is that wrong? How can we say that it wasn't until February 24 that it was not reasonably foreseeable? Isn't there a question of fact on that? Because we're on summary judgment. We're actually on cross motions for summary judgment, which means that both parties asserted to the court there were no material issues of disputed fact. You know what? There's cases on that point. And the cases say that the fact that there are cross motions for summary judgment, that fact doesn't mean that somebody's got to get it. I can tell you there's a lot of cases on that. No, that's correct, Your Honor, and I'm aware of those cases. But what I am saying is at least both parties believed at the time that there was no disputed material fact. And in fact, all of the matters before the court were basically the writings that had been submitted to the court which were the minutes of the various board meetings. And so what you're looking for is a reasonable foreseeability test, when you put it in probability, possibility, whatever it is, is a subjective decision that somebody's got to make. It's not like a hard fact, like somebody made a loan on a certain day. So, I mean, wouldn't it have to be decided by a prior of the fact? I don't believe so because actually I believe that the reasonable foreseeability is an objective test. So it is really the court looking at the facts of the case to make a determination as to whether or not it was reasonably foreseeable or not based on the commercial situation of the party in a sense. And that's what the court had before it in the ongoing discussion among the board members and with the presentation that was made to the bankruptcy court at the time of the sale to get the sale approved. Okay, Mr. Kleiman. Thank you very much. Thank you very much. And we'll have Mr. Reisner back for rebuttal. Thank you. Your Honors, I'd just like to clarify the probabilities test is not the healthiest test. It is the probable versus the mere possibilities. And just to illustrate in the example of the red and black roulette, if the ball falls on the red which causes doom to occur and the employer says we thought it was going to land on black and it wouldn't occur, it imposes a burden on the plaintiff to prove that the probable outcome would have been that it would have landed on red when those things were equal. That can't be the test. If those two things are equal, which they are, then both are reasonably foreseeable. That makes sense to Congress. That makes sense to this court that when those two things are equal, a warrant notice applies. If you impose on the plaintiff the burden of showing that the thing that happened was the probable, we will lose every time. We don't have the money. We don't have the ability to contest a contrary position by management, and that's why it's reasonable foreseeability. In terms of commitments, Your Honor, commitments are one thing. Fulfilling them is another. There are a lot of commitments in this case. Commitment to pay a dip loan by Iturk of $10 million was made, but it was never paid, and Mr. Pieper is in Europe. He's on the lam because Iturk never paid that amount. In terms of Vladimir Putin, Vladimir Putin said in September prior to the November bankruptcy that he had approved and signed off on what was called the factory project for the $200 million, but it was reported that it was hard to say, this was Mr. Pieper, hard to say when that money would arrive. Though Putin had approved something in September, money didn't arrive, company goes into bankruptcy, and now fast forward to February 16th. The court records that on February 16th it was reported that Putin approved the sale and so no more approvals were necessary. The rest of the sentence, which the court did not quote, was that we could not predict a specific closing. Putin or the Kremlin could not predict a specific closing. That was omitted. Well, on the 21st, it's reported that Putin had to think about it again, and when he would make up his final decision, it could not be estimated. So all that was redacted by the court to provide what is a skewed view of what was being said, and in terms of relying on any of those assurances, there is a case in the Sixth Circuit called Pena versus American Packing, which is the case which says that we do not consider subjective assessments of foreseeability because it is an objective test, and Judge Krauss, as you mentioned, taking the word of people who are committed, they have a right. They have a right to be optimistic and to go through with the sale. We don't deny that. Go for it. But taking the objective stand, which is what the risks that you're undertaking are the ones that probably management should bear the consequences of, but employees should not bear the consequences of those risks. Those risks are the ones that trigger a war notice. Your Honor, in closing, the reason why the company closed was not discussed by my colleague. The reason the company closed was not because of black or red. The company walked away from the roulette table. It gave up. It threw in its chips, and it filed for liquidation because, and it told its employees in that 24th email, we have run out of time and money. That was the circumstance that they were staring at when they went into a liquidating Chapter 11 bankruptcy with a finite calendar of how many days they had in which they had to fit all of the things that they needed to do to try to get a sale that would give the secure lenders their money back and maybe help the employees. But it was against that tight, inelastic deadline that these things couldn't possibly have been predicted to have occurred smoothly because they had just been through a track record with Vladimir Putin where whatever he committed could not necessarily be counted on, and therefore it was incumbent on the company to give a notice at that point, and certainly when ITAR came to the table empty-handed, saying we have no money, we don't know when we're going to get it, at that point it was profitable, and it certainly was. When was that date? That date was January 29th. And Eclipse was given over to the hands of the personification of an objective, reasonable businessman who would become head of GM in three weeks. So they were late by 26 days, 27 days. The defendant has never said what the unforeseen business circumstance was in this case. The defendant never said that the failure to come to the closing was the unforeseen business circumstance. Today the defendant did not tell us what the unforeseen business circumstance was. Wasn't the conversion to Chapter 7 the unforeseen business circumstance? No, it wasn't, because Eclipse did that itself. It was the one before the actual conversion. Eclipse decided to convert itself, so it wasn't unforeseen, they decided to do that. The day before the lenders filed that conversion motion, Eclipse had authorized and directed the filing of their own conversion motion. So Eclipse walked away from the roulette table, and that wasn't unforeseen because it did it itself. It was something that wasn't unforeseen. All right. I don't have anything else. Even on the 29th, though, the board has been told, not that we don't know when there's going to be financing, but there's now a delay until February 2nd. And granted, it seems like, as you look back, I mean, hindsight's 20-20, it appears to be a series of assurances that string them along through the month of January and into late February. But there's always a specific commitment of what is about to happen within a matter of days. Putin is on Putin's desk. We're going to hear something in a matter of days. While there are reasons to be doubtful, where there are also on the record those kinds of reassurances, why don't we need to defer to the commercial business judgment in ascertaining whether it's reasonably foreseeable or not? Mr. Kress, a personified commercial reasonable business judgment, and he said in February, I am not going to listen to any verbal assurances about what paper is on whose desk and how many days. He needed to see documentation straight from the government that would say when the approval was made, that funding was coming, and that there would be a clear closing date. He said that on February 2nd. That is clear commercial judgment. He was never given that. And he disregarded all of what was said by the people who were subjective and insiders. And he said, until I get that, I am shutting this down. And he gave every benefit of the doubt to use up the money that was in the till to see if we can get there. And that was Putin's business judgment as well. But someone needed to send a warn notice at that point because it was reasonably foreseeable to someone like Kress, to the secure lenders who put him in charge and said, you'll be the one to make that decision. That's prudent. And he made it reasonably foreseeable to everyone except employees. All right, Mr. Raisner, thank you very much. We thank both counsel for excellent arguments in this case. And we'll take the matter under advisement. Okay. Judge Fischer, what do you want to do now? We'll call you. You'll call me back? Yes. Okay. Thank you, guys. Until today, December 12th at 10.30 a.m. in St. Thomas Prison Office. We're on that one. You guys up? Yes, sir. Good evening, everybody. Good evening. Good evening.